## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| **GARY K. NEEL,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:08cv00011 |
| | ) | **MEMORANDUM OPINION** |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of Social Security,** | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

In this social security case, I affirm the final decision of the Commissioner terminating benefits.

### I. Background and Standard of Review

Plaintiff, Gary K. Neel, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that he was no longer eligible for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2003 & Supp. 2008). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through

Case 1:08-cv-00011-PMS   Document 21   Filed 11/24/08   Page 1 of 31   Pageid#: 337

application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

By decision dated April 11, 2001, Neel was found to be disabled as of December 28, 2000, due to chronic heart failure. (Record, ("R."), at 12, 14.) However, in April 2005, the Social Security Administration terminated Neel's benefits finding that his condition had improved and no longer met a listed impairment. (R. at 12, 26-28, 32-34.) Neel requested a reconsideration, (R. at 12, 35), but the cessation determination was upheld. (R. at 12, 29, 37-38, 45.) Neel requested a hearing before an administrative law judge, ("ALJ"). (R. at 46.) A hearing was held on August 17, 2006, at which Neel was represented by counsel. (R. at 240-58.)

By decision dated March 15, 2007, the ALJ found that, as of June 30, 2005, Neel was no longer disabled. (R. at 12-18.) The ALJ reported that Neel had been disabled since December 28, 2000, and had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 12, 14.) The ALJ found that the medical evidence established that, at the time of the comparison point decision, ("CPD"), on April 11, 2001, Neel had chronic heart failure, which met the criteria of 20 C.F.R. Part 404, Subpart P, Appendix 1, § 4.02(B)(1) and (2). (R. at 14.) The ALJ further found that, as of June 30, 2005, Neel had a severe impairment, namely chronic heart failure,

-2-

but he found that Neel did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 14-15.) The ALJ also found that, as of June 30, 2005, Neel had experienced medical improvement related to his ability to work. (R. at 14.) The ALJ further found that Neel had the residual functional capacity to perform light work[1] that required no driving, working around hazards or working around temperature extremes. (R. at 15.) The ALJ found that Neel experienced slight limitations in interpersonal relations and stress tolerance. (R. at 15.) Thus, the ALJ found that, as of June 30, 2005, Neel was unable to perform his past relevant work. (R. at 17.) However, based on Neel's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that Neel could perform jobs existing in significant numbers in the national economy, including those of a cashier, an interviewer, an information clerk, a nonpostal mail clerk, a factory messenger, an inventory clerk, a general office clerk, a kitchen worker, a janitor, an assembler, a packer and a nonconstruction laborer. (R. at 17-18.) Therefore, the ALJ found that Neel was not under a disability as defined by the Act and was not eligible for benefits as of June 30, 2005. (R. at 18.) *See* 20 C.F.R. § 404.1594(f)(8) (2008 ).

After the ALJ issued his decision, Neel pursued his administrative appeals, (R. at 8), but the Appeals Council denied his request for review. (R. at 5-7.) Neel then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2008). The case is

---

[1]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can do light work, he also can do sedentary work. *See* 20 C.F.R. § 404.1567(b) (2008).

before this court on the Commissioner's motion for summary judgment filed October 21, 2008.[2]

## II. Facts

Neel was born in 1964, (R. at 59), which classifies him as a "younger person" under 20 C.F.R. § 404.1563(c). He has a high school education and past relevant work experience as a saw operator, a truck driver, a warehouse manager and a machinist. (R. at 64-69, 242 .) Neel testified that he had not worked since being awarded disability benefits in April 2001. (R. at 247.) He stated that he experienced shortness of breath and fatigue aggravated by temperature extremes. (R. at 248.) Neel testified that he tired very easily, requiring him to lie down. (R. at 248.) He further testified that he began experiencing headaches in approximately December 2005, ranging from "moderate" to "severe," associated with nausea. (R. at 248-50.) Neel stated that he took Tylenol and would lie down in an effort to alleviate these headaches, which could last from a couple of hours to three to four days. (R. at 248.) He testified that the headaches were due to high blood pressure. (R. at 249.) Neel stated that he had difficulty lifting objects and climbing stairs, again noting shortness of breath. (R. at 249.) He testified that he could not work because of his fatigue and need to lie down. (R. at 250.) Neel testified that he was able to wash dishes, but that he performed no yard work. (R. at 250.) He stated that when he experienced shortness of breath, he feared that his heart would stop. (R. at 251.) Neel testified that he sometimes felt depressed. (R. at 251.)

Dr. Theron Blickenstaff, M.D., a medical expert, also was present and testified

---

[2]The plaintiff has not filed a motion for summary judgment with the court.

-4-

at Neel's hearing. (R. at 253-55.) Dr. Blickenstaff opined that Neel's condition had improved so that he could perform light work that did not require driving, working around heights or with machinery or working in extreme heat. (R. at 254-55.) Thomas Schacht, Psy.D., a psychological expert, also was present and testified at Neel's hearing. (R. at 255.) Schacht noted that while Neel had experienced a severe problem with alcoholism in the past, the record showed that he had been sober since early 2001. (R. at 255.) Schacht further testified that the record did not evidence any mental limitations since Neel became sober. (R. at 255.) Schacht testified that there might be some benefit to obtaining a psychological consultative examination because Neel had "some pretty bad metabolic derangements from the alcohol" which caused some episodes of delirium, from which people sometimes do not fully recover, causing some residual cognitive impairment. (R. at 255.)

Cathy Sanders, a vocational expert, also was present and testified at Neel's hearing. (R. at 245.) She classified Neel's past work as a saw operator as medium[3] and unskilled, as a warehouse manager as medium and skilled and as a machinist as heavy[4] and skilled. (R. at 245.) Sanders was asked to consider an individual of Neel's education with the limitations testified to by Dr. Blickenstaff. (R. at 255-56.) Sanders testified that such an individual could perform jobs existing in significant numbers in the national economy, including those of a nonconstruction laborer, an assembler, a

---

[3]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If someone can do medium work, he also can do light and sedentary work. *See* 20 C.F.R. § 404.1567(c) (2008).

[4]Heavy work involves lifting items weighing up to 100 pounds at a time with frequent lifting or carrying of items weighing up to 50 pounds. If someone can do heavy work, he also can do medium, light and sedentary work. *See* 20 C.F.R. § 404.1567(d) (2008).

cleaner, a hand packager, an inventory clerk, an office assistant and a counter clerk. (R. at 256.) The ALJ left the record open for the submission of additional evidence, including a consultative psychological examination. (R. at 256.)

A supplemental hearing was held on February 5, 2007, at which Neel was again represented by counsel. (R. at 259-69.) Neel testified that he could not perform even entry-level unskilled work due to his fear of overworking his heart. (R. at 262.) Specifically, he stated that he feared having a heart attack. (R. at 263.)

Dr. Edward Griffin, M.D., a medical expert, also was present and testified at Neel's supplemental hearing. (R. at 263-64.) Dr. Griffin agreed with Dr. Blickenstaff's previous testimony that Neel's condition had improved. (R. at 263.) Specifically, Dr. Griffin noted that Neel had been admitted to the hospital in December 2000 with heart failure. (R. at 263.) He noted an ejection fraction at that time of 20 percent and a global loss of contractility. (R. at 263-64.) Dr. Griffin also noted that it was unclear whether Neel's heart condition was due to alcoholism, but that the record showed he continued to drink until 2003. (R. at 264.) Dr. Griffin opined that whether alcohol was the cause of Neel's heart condition or not, it would be material to any continuing problems from 2001 until 2003 when he stopped drinking.[5] (R. at 264.) Dr. Griffin noted an echocardiogram taken in July 2003, which showed an ejection fraction of 45 percent, a significant improvement over the one in 2000. (R. at 264.) Dr. Griffin further noted that a Doppler study in 2003 showed some mild tricuspid regurgitation, which he described as clinically insignificant. (R.

---

[5]The undersigned notes that the information contained in the record on appeal shows that Neel claimed to have abstained from alcohol since early 2001.

-6-

at 264.)  For all of these reasons, Dr. Griffin agreed with Dr. Blickenstaff's opinion that Neel's condition had significantly improved as of July 2003.  (R. at 264.)  He further stated that he agreed with Dr. Blickenstaff's assessment of functional limitations.  (R. at 264.)

Schacht again testified at Neel's supplemental hearing.  (R. at 264-65, 267-68.) He noted that the consultative psychological examiner found no more than slight limitations in personal functioning and stress tolerance.  (R. at 264-65.)  Schacht opined that these limitations were not unreasonable, and he noted that Neel's psychological condition was untreated.  (R. at 265.)  He further opined, based on Neel's school records, that Neel should have no restrictions on his ability to learn or carry out instructions.  (R. at 267.)  Specifically, Schacht noted average IQ findings by psychologist Latham, as well as multiple achievement test scores placing Neel in the average range.  (R. at 268.)

Robert Spangler, a vocational expert, also was present and testified at Neel's supplemental hearing.  (R. at 265-67.)  Spangler was asked to consider a hypothetical individual of Neel's age, education and work history who could occasionally lift items weighing up to 30 pounds and frequently lift items weighing up to 15 pounds, who could not drive hazardous equipment, who could not work around extreme temperatures and who was slightly limited in interpersonal relations and in dealing with stress.  (R. at 265-66.)  Spangler classified Neel's past work as a machinist as between medium and heavy and skilled, as a warehouse manager as medium and skilled, as a saw operator as medium and semiskilled and as a furniture saw operator as medium and semiskilled.  (R. at 266.)  However, Spangler testified that Neel had

no transferable skills. (R. at 266.) Spangler opined that if such an individual could perform work at the light exertional level, he could perform the jobs of a cashier, an interviewer, an information clerk, a nonpostal mail clerk, a factory messenger, an inventory clerk, a general office clerk, a kitchen worker, a janitor, an assembler, a hand packer and a nonconstruction laborer. (R. at 266-67.)

In rendering his decision, the ALJ reviewed records from Dr. James E. Patterson, M.D.; Smyth County Community Hospital; Dr. Douglas P. Williams, M.D.; Dr. Frank M. Johnson, M.D., a state agency physician; Holston Valley Medical Center; Dr. Larry H. Cox, M.D.; Dr. Randall Hays, M.D., a state agency physician; Dr. Samuel D. Vernon, M.D.; Dr. F. Joseph Duckwall, M.D., a state agency physician; Smyth County Community Hospital Outreach Clinic; and Edward E. Latham, Ph.D., a clinical psychologist.

Neel was admitted to Smyth County Community Hospital on September 28, 1999, for evaluation after reporting finding himself lying on the road with an apparent dislocated jaw. (R. at 105.) Neel reported no history of blacking out. (R. at 96.) His blood pressure was elevated, but his heart was regular with clear carotids and intact cranial nerves. (R. at 96.) He presented with neck soreness, and he denied any recent alcohol or drug use. (R. at 105.) Neel was quite confused, but a neurological examination was normal. (R. at 105.) No heart murmurs were appreciated. (R. at 106.) Dr. James E. Patterson, M.D., opined that he either was suffering from delirium tremor or a possible seizure disorder. (R. at 106.) A toxicology screen was positive for benzodiazepines. (R. at 112.) X-rays of the cervical spine showed a partial congenital blocked vertebra of C2 and C3, as well as advanced degenerative changes

of the C4-5 disc space. (R. at 114.) X-rays of the mandible showed a dislocation on both condyles. (R. at 115.) Neel was discharged the following day. (R. at 102.) He was again admitted to Smyth County Community Hospital on October 4, 1999, after again blacking out and presenting in an altered mental state. (R. at 116.) He complained of dizziness, vertigo and increasing weakness. (R. at 117.) Neel was treated with medications. (R. at 117.) An EKG taken on October 4, 1999, showed atrial fibrillation. (R. at 96, 120-21.) In an effort to evaluate seizures, an electroencephalogram, ("EEG"), also was performed on October 4, 1999, which yielded normal results. (R. at 119.) Neel was diagnosed with labrynthitis and a recurrent seizure. (R. at 117.) The following day, Neel was asymptomatic, and a repeat EKG was normal. (R. at 95, 100-01.)

On January 20, 2000, Neel presented to the emergency department at Smyth County Community Hospital with complaints of nausea, vomiting and diarrhea. (R. at 124.) It was noted that Neel's breath had a strange odor, and he was unable to stand due to shaking. (R. at 124.) Neel experienced a mild seizure while in the emergency room, for which he was given medications. (R. at 124.) A chest x-ray revealed a "borderline" heart size with no focal infiltrate. (R. at 131.) Neel was again diagnosed with labrynthitis and recurrent seizure. (R. at 123.) On February 21, 2000, Neel again presented to the emergency department at Smyth County Community Hospital with complaints of vomiting, diarrhea, lightheadedness and weakness. (R. at 133, 135.) It was noted that he was lethargic and shaking. (R. at 133.) Neel declined admission. (R. at 133.) He was administered medications. (R. at 133, 135.) The following day, Neel followed up with Dr. Patterson. (R. at 93, 187.) Blood work revealed that his amylase levels were high, suggesting pancreatitis. (R. at 93, 98-99, 187.)

Case 1:08-cv-00011-PMS   Document 21   Filed 11/24/08   Page 9 of 31   Pageid#: 345

Neel saw Dr. Douglas P. Williams, M.D., on February 25, 2000. (R. at 144.) Neel informed Dr. Williams that he was not consuming alcohol of any kind at the time of his September 1999 hospitalization. (R. at 144.) Dr. Williams noted that Neel's cranial nerves were intact, muscle strength was symmetric bilaterally, reflexes were 2+/4 and toes were downgoing and gait, cerebellar and Romberg's sign[6] were unremarkable. (R. at 144.) Dr. Williams noted concern that Neel had developed epilepsy, and he recommended that he initiate Dilantin. (R. at 144.)

Dr. Frank M. Johnson, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment on April 19, 2000, finding that Neel had no exertional impairments. (R. at 145-52.) He opined that Neel should never climb ladders, ropes or scaffolds, but could frequently climb ramps and stairs, balance, stoop, kneel, crouch and crawl. (R. at 148.) Dr. Johnson imposed no manipulative, visual or communicative limitations. (R. at 148-49.) He opined that Neel should avoid all exposure to hazards such as machinery and heights. (R. at 150.)

Neel was again admitted to Smyth County Community Hospital on December 29, 2000, with complaints of marked dyspnea. (R. at 153.) It was noted that Neel was a "longstanding alcoholic." (R. at 153.) It further was noted that Neel could barely walk across the floor and could barely lie down without marked shortness of breath. (R. at 153.) A chest x-ray revealed an "enormous" heart, and an echocardiogram revealed an ejection fraction no better than 20 percent with a huge dilated heart with akinetic muscle everywhere pumping "practically not at all." (R. at 153, 156, 161.)

---

[6]Romberg's sign is a swaying of the body or falling when standing with the feet close together and the eyes closed. *See* Dorland's Illustrated Medical Dictionary, ("Dorland's"), 1525 (27th ed. 1988).

He was diagnosed with marked cardiomyopathy, probably due to alcoholism, resolving pancreatitis, seizure disorder and both acute and chronic alcoholism. (R. at 154, 156.) Neel was referred to Holston Valley Cardiology the same day. (R. at 153, 162.) At that time, Neel informed Dr. Larry H. Cox, M.D., that he drank approximately three to four shots of liquor per day, sometimes more on the weekends. (R. at 164.) Dr. Cox noted echocardiogram findings revealing cardiomegaly, global hypokinesis to akinesis with an estimated ejection fraction of 20 percent, mitral regurgitation and tricuspid regurgitation and mild pericardial effusion. (R. at 164.) Neel continued to deny any pain, but continued to complain of shortness of breath, much better than previously. (R. at 164.) Neel further informed Dr. Cox that he had noticed severe edema in his feet and legs, orthopnea[7] and paroxysmal nocturnal dyspnea, ("PND"),[8] over the previous week and a half. (R. at 165.) Physical examination revealed some jugular-venous distension, ("JVD"), and Neel's respiratory effort was slightly increased. (R. at 166.) He had a rapid heart rate with regular rhythm, but a gallop was noted. (R. at 166.) His carotids, femoral pulses and pedal pulses were 2+ bilaterally without bruits. (R. at 166.) Pretibial edema was 2+. (R. at 166.) Neel's neurological examination was grossly intact. (R. at 166.) Dr. Cox diagnosed dilated cardiomyopathy, probably alcohol-related, new onset of congestive heart failure and a seizure disorder. (R. at 166.) Dr. Cox doubted that Neel had coronary artery disease. (R. at 166.) Neel was given an ACE inhibitor, spironolactone, Librium and intravenous Lasix. (R. at 167.) He was encouraged to

---

[7]Orthopnea refers to difficulty breathing except in an upright position. *See* Dorland's at 1192.

[8]Paroxysmal nocturnal dyspnea is a form of respiratory distress related to posture (especially reclining at night) and usually attributed to congestive heart failure with pulmonary edema. *See* Dorland's at 520.

discontinue all alcohol. (R. at 167.) Dr. Cox noted that Neel's breathing significantly improved over the following 24 hours. (R. at 162.) Dr. Cox strongly urged Neel to completely discontinue all alcohol, informing him that this could bring about improvement in his overall ejection fraction. (R. at 162-63.) Neel agreed to this discontinuation. (R. at 171.) He was discharged on December 30, 2000, with instructions to follow up with Dr. Cox in two weeks. (R. at 163.) He was prescribed furosemide, spironolactone, Enalapril and Dilantin. (R. at 171.) In a letter to Dr. Patterson dated December 30, 2000, Dr. Cox stated that he would place Neel on beta blocker therapy after establishing a reasonable dose of an ACE inhibitor. (R. at 171.)

On January 5, 2001, Dr. Randall Hays, M.D., a state agency physician, completed a Residual Physical Functional Capacity Assessment, finding that Neel could perform medium work. (R. at 178-86.) Dr. Hays opined that Neel could never climb ladders, ropes or scaffolds, but could frequently climb ramps and stairs, balance, stoop, kneel, crouch and crawl. (R. at 181.) He imposed no manipulative, visual or communicative limitations. (R. at 181-82.) Dr. Hays opined that Neel should avoid all exposure to hazards, such as heights and machinery. (R. at 183.) Dr. Hays had none of the medical records pertaining to Neel's cardiomyopathy before him in making his determination. Instead, he reviewed only the medical records pertaining to Neel's possible seizure disorder. (R. at 180, 184.)

Neel saw Dr. Cox on January 12, 2001, for a follow-up evaluation. (R. at 170.) Dr. Cox noted that Neel was doing well, and he claimed to have been avoiding alcohol totally. (R. at 170.) Dr. Cox noted that Neel was having no dyspnea at rest, orthopnea, PND, ankle edema or any syncope. (R. at 170.) Neel did inform Dr. Cox

-12-

that he became short of breath and tired with exertion. (R. at 170.) Physical examination revealed normal venous pressure, carotids were equal in upstroke without bruits, point of maximal impulse, ("PMI"),[9] was lateral to the midclavicular line, there was a normal S1, a probable physiologically split S2, a summation gallop at the apex, no definite murmurs, no peripheral edema, intact peripheral pulses and no cyanosis or clubbing. (R. at 170.) Dr. Cox concluded that Neel's cardiomyopathy appeared to be under reasonable control. (R. at 170.) He was not having any fluid overload, although he still had a resting sinus tachycardia with a summation gallop. (R. at 170.) Although his blood pressure was borderline, Dr. Cox did not wish to increase Neel's dosage of Enalapril at that time. (R. at 170.) He again noted his desire to place Neel on beta blocker therapy in the future if feasible. (R. at 170.) Neel was scheduled to return to Dr. Cox in three weeks. (R. at 170.)

When Neel saw Dr. Cox on March 17, 2003, he stated that he was doing well. (R. at 195.) Neel reported abstaining from alcohol. (R. at 195.) He denied orthopnea, PND and ankle edema. (R. at 195.) Neel reported continued difficulty with exercise capacity and tiring easily. (R. at 195.) Physical examination was the same as previously, except that Neel's respirations were unlabored, the PMI was not palpable and no gallop of the heart was noted. (R. at 195.) Dr. Cox opined that Neel's cardiomyopathy was stable, his exercise capacity was good, he had no fluid overload and he had been able to abstain from alcohol. (R. at 195.) He made no change in Neel's medications and scheduled a follow-up in four months, at which time another echocardiogram would be performed. (R. at 195.)

---

[9]PMI refers to the area of the chest where the heartbeat is felt the strongest. *See* Dorland's at 1324.

Case 1:08-cv-00011-PMS   Document 21   Filed 11/24/08   Page 13 of 31   Pageid#: 349

A repeat echocardiogram was performed on July 29, 2003, showing normal left ventricular chamber size, mildly impaired left ventricular systolic function with mild global left ventricular hypokinesis and with an ejection fraction of approximately 45 percent, no regional wall motion abnormality, mild left atrial enlargement, borderline dilatation of the aortic root, normal cardiac valvular structures and leaflet excursion, normal right heart, no cardiac mass or thrombus, no pericardial effusion and mild tricuspid regurgitation. (R. at 199.)

When Neel saw Dr. Cox on August 8, 2003, Dr. Cox noted that Neel was doing well. (R. at 193.) Neel reported that he had improved significantly and was not having very many problems with exercise capacity. (R. at 193.) He had no chest pain, dyspnea on exertion, orthopnea, PND, ankle edema or syncope. (R. at 193.) Physical examination revealed negative findings. (R. at 193.) Dr. Cox noted the findings of the July 29, 2003, echocardiogram. (R. at 193.) Thus, Dr. Cox opined that Neel's cardiomyopathy had improved significantly. (R. at 193.) He noted that it was difficult to know whether Neel might have had myocarditis that had healed or whether it was an alcoholic cardiomyopathy that was doing better with the avoidance of alcohol. (R. at 193.) In any event, Neel's prognosis was deemed improved. (R. at 194.) Dr. Cox decreased Neel's dosage of furosemide, stating that he might eventually taper him off completely, and he continued his other medications. (R. at 194.) Neel was scheduled to return in six months. (R. at 193.)

On February 5, 2004, Neel again saw Dr. Cox, who noted that Neel was doing well. (R. at 191.) He denied shortness of breath, chest pain, orthopnea, PND or ankle edema. (R. at 191.) Physical examination was again negative. (R. at 191.) Dr. Cox

opined that Neel's cardiomyopathy was stable, and his ejection fraction had increased significantly. (R. at 191.) Neel reported total abstinence from alcohol, which Dr. Cox opined might have helped improve his ejection fraction. (R. at 191.) Dr. Cox asked Neel to decrease his Lasix and continue his other medications. (R. at 191.)

On September 2, 2004, Neel again saw Dr. Cox, who noted that Neel was doing well. (R. at 190.) Neel again reported no dyspnea, orthopnea, PND, ankle edema, chest pain or syncope. (R. at 190.) Physical examination was unremarkable. (R. at 190.) Dr. Cox again opined that Neel's cardiomyopathy was stable, and he continued him on the same medications. (R. at 190.) Neel was advised to return in six months. (R. at 190.) Lab work performed on August 4, 2004, showed low potassium and chloride, but by August 23, 2004, results were normal. (R. at 196-97.)

Neel saw Dr. Samuel D. Vernon, M.D., on November 1, 2004, to establish new patient status. (R. at 202.) He stated that he was on disability secondary to dilated cardiomyopathy. (R. at 202.) Neel denied significant dyspnea, PND, orthopnea, ankle edema or polyuria.[10] (R. at 202.) Although Neel reported some limitations on his activity, he stated that he was basically able to pretty well perform activities of daily living. (R. at 202.) A physical examination was negative. (R. at 202.) Dr. Vernon diagnosed dilated cardiomyopathy. (R. at 202.)

On January 28, 2005, Neel presented to the emergency department at Smyth County Community Hospital with complaints of a short episode of stabbing pain in

---

[10]Polyuria is the passage of a large volume of urine in a given period. *See* Dorland's at 1336.

the back. (R. at 210.) A chest x-ray revealed no acute findings. (R. at 215.) Neel was prescribed Plavix. (R. at 213.)

Neel saw Dr. Cox on March 14, 2005, with no complaints of shortness of breath, chest pain, orthopnea, PND, ankle edema, palpitations or syncope. (R. at 188-89.) He informed Dr. Cox that he continued to abstain from alcohol. (R. at 188.) Physical examination was again negative. (R. at 188.) Dr. Cox concluded that Neel's cardiomyopathy was stable with no symptoms and good functional capacity. (R. at 188.) Neel was instructed to return in six months for follow-up lab work and testing. (R. at 189.)

On April 18, 2005, Dr. Frank M. Johnson, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment, finding that Neel could perform light work. (R. at 216-25.) Dr. Johnson opined that Neel could never climb ladders, ropes or scaffolds, but could frequently climb ramps and stairs, balance, stoop, kneel, crouch and crawl. (R. at 218.) Dr. Johnson imposed no manipulative, visual or communicative limitations. (R. at 219-20.) He concluded that Neel should avoid concentrated exposure to extreme cold. (R. at 220.) Dr. Johnson opined that Neel's allegations were not fully credible. (R. at 221.) Dr. Johnson compared the findings at the time of the CPD to the then-current findings, noting the January 29, 2003, echocardiogram. (R. at 224.) Dr. Johnson further noted the March 17, 2003, examination by Dr. Cox showing that Neel's cardiomyopathy was stable and that he had good exercise capacity, no fluid overload and that he had abstained from alcohol. (R. at 224.) Dr. Johnson further noted Dr. Cox's examination of February 5, 2004, which showed stable cardiomyopathy, a significantly increased ejection fraction and

-16-

that Neel continued to abstain from alcohol. (R. at 224.) Finally Dr. Johnson noted the March 14, 2005, examination revealing that Neel was asymptomatic and had continued to abstain from alcohol. (R. at 224.) Based on this evidence, Dr. Johnson concluded that Neel's disability had significantly improved. (R. at 224.) All of Dr. Johnson's findings were affirmed by Dr. F. Joseph Duckwall, M.D., another state agency physician, on April 28, 2005. (R. at 224.)

On May 25, 2005, Neel returned to see Dr. Vernon for a six-month follow-up evaluation. (R. at 229.) Neel reported occasional dyspnea on exertion with no symptoms at rest. (R. at 229.) He denied significant ankle edema, PND or orthopnea. (R. at 229.) Physical examination revealed a regular heart rhythm without murmurs or gallops, and no edema was noted. (R. at 229.) Neel was again diagnosed with cardiomyopathy and was advised to continue medications and keep his follow-up appointment with Dr. Cox. (R. at 229.)

Neel saw Edward E. Latham, Ph.D., a licensed clinical psychologist, for a psychological evaluation on October 6, 2006, at the request of the ALJ. (R. at 231-35.) Neel denied the use of alcohol since developing heart problems in 2000. (R. at 231.) Latham noted that the record showed denials of alcohol use since at least 2003, and likely before. (R. at 231.) Latham noted that after Neel stopped drinking, his heart condition improved. (R. at 231.) Mental status examination showed that Neel was alert and adequately oriented with no signs of pathological disturbance in thought process, thought content or perception. (R. at 232.) His mood was slightly anxious. (R. at 232.) Latham noted no history of psychiatric or psychological treatment. (R. at 232.) He reported a fear of going out by himself due to his history of seizures. (R.

-17-

at 232.) Latham administered the Wechsler Adult Intelligence Scale-Third Edition, ("WAIS-III"), on which Neel obtained a verbal IQ score of 95, a performance IQ score of 102 and a full-scale IQ score of 98, placing him in the average range of intellectual functioning. (R. at 232, 235.) Latham also administered the Wide Range Achievement Test-Third Edition, ("WRAT-3"), the Minnesota Multiphasic Personality Inventory-2, ("MMPI-2"), and the Miller Forensic Assessment of Symptoms Test, ("M-FAST"). (R. at 235.) Latham noted that testing suggested that Neel had probable psychological difficulties that were somatoform in nature. (R. at 232.) Emotionally dependent character traits also were suggested, which indicated difficulties in handling conflict and resolving/rebounding from loss. (R. at 232.) There was no evidence of psychosis. (R. at 232.)

Latham diagnosed an anxiety disorder, not otherwise specified, alcohol dependence, in remission, and a personality disorder, not otherwise specified. (R. at 233.) He concluded that Neel could understand, retain and follow simple instructions and perform routine, repetitive tasks. (R. at 233.) He further found that Neel's attention/concentration abilities were sufficient for simple tasks and his ability to relate interpersonally was mildly impaired. (R. at 233-34.) His capacity to handle everyday stressors was mildly impaired. (R. at 234.)

Latham also completed a Medical Source Statement Of Ability To Do Work-Related Activities (Mental), finding that Neel was slightly limited in his abilities to interact appropriately with the public and supervisors, to respond appropriately to work pressures in a usual work setting and to respond appropriately to changes in a routine work setting. (R. at 236-39.) However, Latham opined that Neel's ability to

-18-

understand, remember and carry out instructions was not affected by his impairment. (R. at 236.)

### III.  Analysis

The Commissioner uses an eight-step process in evaluating whether a claimant's DIB benefits should be terminated.  *See* 20 C.F.R. §  404.1594(f) (2008). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has an impairment that meets or equals the requirements of a listed impairment; 3) has seen medical improvement in his previously disabling condition; 4) has seen an increase in his residual functional capacity; 5) an exception to the medical improvement applies; 6) has a severe impairment; 7) can return to his past relevant work; and 8) if not, whether he can perform other work.  *See* 20 C.F.R. § 404.1594(f). If the Commissioner finds conclusively that a claimant is disabled at any point in this process, review does not proceed to the next step.  *See* 20 C.F.R. § 404.1594(f).

Neel argues that the ALJ erred by failing to find that he suffered from a severe impairment.  (Brief In Support Of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief"), at 14.)  Neel also argues that the ALJ erred by failing to accord "great weight" to the opinions of his treating and examining physicians and by failing to weigh these opinions using the factors set forth at 20 C.F.R. § 404.1527. (Plaintiff's Brief at 12.)  In particular, Neel argues that the ALJ should have obtained a consultative physical examination before making his unfavorable decision instead of relying on the residual functional capacity assessment of a nonexamining state

-19-

agency physician.  (Plaintiff's Brief at 13.)  Neel next argues that the ALJ erred in his credibility determination and in his pain analysis.  (Plaintiff's Brief at 12-14.)  It appears that Neel also argues that the ALJ erred by finding that he could perform even low-stress unskilled jobs.  (Plaintiff's Brief at 15-16.)

As a preliminary matter, I note that the previous finding of Neel's disability does not impose a presumption of continuing disability.  *See* 42 U.S.C.A. § 423(f) (West 2003 & Supp. 2008); *Crawford v. Sullivan*, 935 F.2d 655, 656-57 (4ᵗʰ Cir. 1991); *Rhoten v. Bowen*, 854 F.2d 667, 669 (4ᵗʰ Cir. 1988). Instead, the Commissioner must demonstrate that the termination of benefits was based on a consideration of all the evidence in the record and a finding that the claimant was able to engage in substantial gainful activity.  *See* 42 U.S.C. § 423(f); *Crawford*, 935 F.2d at 656-57.

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings.  This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence.  *See Hays*, 907 F.2d at 1456.  In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence.  *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4ᵗʰ Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein.  *See Hays,* 907

F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(d), if he sufficiently explains his rationale and if the record supports his findings.

Based on my review of the record, I find that substantial evidence supports the ALJ's finding that Neel's disability ceased as of June 30, 2005, due to medical improvement related to his ability to do work. I also find that substantial evidence exists to support the ALJ's finding with regard to Neel's residual functional capacity.

I first will address Neel's argument that the ALJ erred by failing to find that he continued to have a severe impairment. This argument simply is incorrect. The ALJ found that, as of June 30, 2005, the date Neel was deemed no longer to be disabled, he continued to have a severe impairment, namely chronic heart failure. (R. at 14-15.) Specifically, the ALJ stated as follows: "the claimant did not develop any additional impairments after the CPD through June 30, 2005. Thus, the claimant continued to have the same impairment that he had at the time of the CPD." (R. at 14.) The ALJ already had noted that Neel's impairment at the time of the CPD was chronic heart failure. (R. at 14.) Then, the ALJ proceeded to state that, as of June 30, 2005, Neel's impairment was severe. (R. at 15.) Thus, it is clear from the ALJ's decision, that he found that, as of June 30, 2005, Neel continued to suffer from severe chronic heart failure. For these reasons, I find that Neel's argument that the ALJ erred by failing to find that he continued to suffer from a severe impairment simply is incorrect.

-21-

I next will address Neel's argument that the ALJ erred in his weighing of the medical evidence. For the following reasons, I reject this argument as well. Neel argues that the ALJ improperly relied on the nonexamining medical experts and a reviewing state agency physician's physical residual functional capacity assessment in concluding that he no longer had a severe impairment. (Plaintiff's Brief at 14.) As just discussed, the ALJ did find that Neel continued to have a severe impairment, so the court will construe this portion of Neel's argument to read that he was "no longer disabled." The Fourth Circuit has held that the ALJ must consider objective medical facts and the opinions and diagnoses of both treating and examining medical professionals, which constitute a major part of the proof of disability cases. *See McLain v. Schweiker*, 715 F.2d 866, 869 (4th Cir. 1983). The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. § 404.1527(d) (2008). However, "[c]ircuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)). In fact, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

As the Commissioner notes in his brief, Neel does not point specifically to any treating physician's opinion that he alleges that the ALJ accorded improper weight. In any event, my review of the record reveals that the ALJ properly weighed the evidence. For instance, subsequent to Neel's hospital admission in December 2000, when he had an ejection fraction of 20 percent with akinetic muscle, (R. at 153, 156,

-22-

171), Neel's condition began to improve. In December 2000, Neel exhibited severe shortness of breath, severe edema in the feet and legs, orthopnea and PND. (R. at 165.) Neel also exhibited some JVD, and he had a slightly increased respiratory effort. (R. at 166.) He had a rapid heard rate with a gallop. (R. at 166.) Dr. Cox diagnosed Neel with dilated cardiomyopathy, probably alcohol-related, new onset of congestive heart failure and a seizure disorder. (R. at 166.) Neel was treated with medications and was urged to discontinue all use of alcohol. (R. at 162-63, 167.) The medical records reveal that Neel heeded Dr. Cox's instructions, abstaining from the use of alcohol and, beginning only a couple of weeks later, Neel's condition had begun to improve. For instance, he reported that he experienced shortness of breath and fatigue only with exertion. (R. at 170.) Likewise, he had no ankle edema, orthopnea, PND or syncope. (R. at 170.) Physical examination revealed normal venous pressure, carotids were equal in upstroke without bruits, PMI was lateral to the midclavicular line, he had normal S1, a probable physiologically split S2, no peripheral edema, intact peripheral pulses and no cyanosis or clubbing. (R. at 170.) Dr. Cox concluded that Neel's cardiomyopathy was under reasonable control. (R. at 170.) When Neel again saw Dr. Cox in March 2003, the only symptom Neel exhibited was tiring easily. (R. at 195.) Dr. Cox opined that Neel's exercise capacity was good, he had no fluid overload and his cardiomyopathy was stable. (R. at 195.) Neel had continued to abstain from alcohol. (R. at 195.)

Furthermore, a repeat echocardiogram performed on July 29, 2003, revealed that Neel's ejection fraction had increased to approximately 45 percent, there was no regional wall motion abnormality, only mild left atrial enlargement, normal left ventricular chamber size, only mildly impaired left ventricular systolic function with

-23-

only mild global left ventricular hypokinesis, no cardiac mass or thrombus, no pericardial effusion and only mild tricuspid regurgitation. (R. at 199.) When Neel saw Dr. Cox the following month, Neel reported that he had improved significantly and was not having many problems with exercise capacity. (R. at 193.) A physical examination was again negative, and Dr. Cox opined that Neel's cardiomyopathy had improved significantly. (R. at 193.) He further deemed Neel's prognosis improved. (R. at 194.) When Neel saw Dr. Cox for a six-month follow-up evaluation in February 2004, he again noted that Neel was doing well. (R. at 191.) A physical examination was again negative. (R. at 191.) Dr. Cox opined that Neel's cardiomyopathy was stable, and he noted that his ejection fraction had increased significantly. (R. at 191.) Neel again reported total abstinence from alcohol, which Dr. Cox opined might have helped improve his ejection fraction. (R. at 191.) Likewise, in September 2004, Dr. Cox again noted that Neel was doing well. (R. at 190.) Neel's physical examination was normal, and Dr. Cox opined that Neel's cardiomyopathy was stable. (R. at 190.)

When Neel saw Dr. Vernon for the first time on November 1, 2004, he again was asymptomatic, and he stated that he was basically able to perform activities of daily living. (R. at 202.) A physical examination was negative. (R. at 202.) A chest x-ray taken on January 28, 2005, showed no acute findings. (R. at 215.) When Neel saw Dr. Cox in March 2005, he remained asymptomatic, and a physical examination was negative. (R. at 188.) He informed Dr. Cox that he continued to abstain from alcohol. (R. at 188.) Dr. Cox concluded that Neel's cardiomyopathy was stable with no symptoms and good functional capacity. (R. at 188.) When Neel saw Dr. Vernon in May 2005, he reported only occasional dyspnea on exertion. (R. at 229.) Physical

examination was negative, and Dr. Vernon continued Neel on his medications and advised him to keep his follow-up appointment with Dr. Cox.  (R. at 229.)

As is evidenced by the above, neither of Neel's treating physicians, one of whom is a cardiologist who has treated Neel since his diagnoses of cardiomyopathy and congestive heart failure in December 2000, placed any restrictions on Neel.  In fact, Dr. Cox, Neel's long-time treating cardiologist, consistently noted improvement in Neel's condition.  Furthermore, the state agency physician who completed the Physical Residual Functional Capacity Assessment of Neel on April 18, 2005, had the bulk of these treatment notes before him in reaching his conclusion that Neel could perform light work reduced by an inability to climb ladders, ropes or scaffolds and a need to avoid concentrated exposure to extreme cold.  Specifically, Dr. Johnson referenced the July 29, 2003,[11] echocardiogram showing an increased ejection fraction, as well as follow-up evaluations by Dr. Cox in March 2003, February 2004 and March 2005.  (R. at 224.)

While the ALJ, in his decision, stated that he was giving great weight to the state agency physician's April 18, 2005, Physical Residual Functional Capacity Assessment, he further noted that this assessment was consistent with the "remaining documentary evidence of record."  (R. at 16.)  The ALJ specifically noted the July 2003[12] echocardiogram results, as well as Dr. Cox's progress notes evidencing that

---

[11]Dr. Johnson actually referenced a January 29, 2003, echocardiogram. However, it appears that this is simply a typographical error and that Dr. Johnson was referencing the July 29, 2003, echocardiogram.

[12]The ALJ also referenced a January 2003 echocardiogram. However no such echocardiogram exists. It appears that the ALJ might have used the January 2003 date referenced

Neel's cardiomyopathy had stabilized, that he had good exercise capacity, that he had no fluid overload and that he had been able to abstain from alcohol. (R. at 14.) The ALJ also noted Neel's denials of shortness of breath and ankle swelling and normal heart examinations. (R. at 14.)

For all of these reasons, the undersigned finds, contrary to Neel's argument, that the ALJ accorded great weight to the findings of his treating physicians in concluding that he was no longer disabled as of June 30, 2005, and that substantial evidence supports such a weighing of the evidence. For all of the same reasons, the court finds that the ALJ's physical residual functional capacity finding is supported by substantial evidence.

Next, Neel argues that the ALJ erred in his credibility determination and in his pain analysis. Again, I disagree. It is well-settled that it is the province of the ALJ to assess the credibility of a witness or claimant. *See Hays*, 907 F.2d at 1456; *Taylor*, 528 F.2d at 1156. Furthermore, "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984). Ordinarily, this court will not disturb the ALJ's credibility findings unless "it appears that [his] credibility determinations are based on improper or irrational criteria." *Breeden v. Weinberger*, 493 F.2d 1002, 1010 (4th Cir. 1974).

Here, the ALJ found that, while Neel's chronic heart failure could have reasonably been expected to produce the alleged symptoms, Neel's statements

in Dr. Johnson's assessment.

-26-

concerning the intensity, persistence and limiting effects of these symptoms were not entirely credible. (R. at 16.) To support this finding, the ALJ noted that Dr. Cox had indicated on March 14, 2005, that Neel's "cardiomyopathy appears to be stable. He does not have any symptoms and appears to have good functional capacity." (R. at 16.) The ALJ further based this credibility finding on the objective evidence of record which showed that Neel was doing well with no shortness of breath, fatigue and weakness. (R. at 16.) Moreover, the ALJ noted Neel's testimony that he feared doing too much for fear of his heart stopping. (R. at 16.) However, the ALJ noted a lack of objective evidence to support Neel's fear. (R. at 16.) Given this, the undersigned finds that the ALJ's credibility determination was not based on "improper or irrational criteria," and this determination will not be disturbed.

The Fourth Circuit has adopted a two-step process for determining whether a claimant is disabled by pain. First, there must be objective medical evidence of the existence of a medical impairment which could reasonably be expected to produce the actual amount and degree of pain alleged by the claimant. *See Craig*, 76 F.3d at 594. Second, the intensity and persistence of the claimant's pain must be evaluated, as well as the extent to which the pain affects the claimant's ability to work. *See Craig*, 76 F.3d at 595. Once the first step is met, the ALJ cannot dismiss the claimant's subjective complaints simply because objective evidence of the pain itself is lacking. *See Craig*, 76 F.3d at 595. This does not mean, however, that the ALJ may not use objective medical evidence in evaluating the intensity and persistence of pain. In *Craig*, the court stated:

> Although a claimant's allegations about [his] pain may not be discredited
> solely because they are not substantiated by objective evidence of the

pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges [he] suffers. ...

*Craig,* 76 F.3d at 595. Furthermore, the ALJ's assessment of a claimant's credibility regarding the severity of pain is entitled to great weight when it is supported by the record. *See Shively*, 739 F.2d at 989-90. "[S]ubjective evidence of pain cannot take precedence over objective medical evidence or the lack thereof." *Parris v. Heckler*, 733 F.2d 324, 327 (4th Cir. 1984). As in the case of other factual questions, credibility determinations as to a claimant's testimony regarding his pain are for the ALJ to make. *See Shively*, 739 F.2d at 989-90. To hold that an ALJ may not consider the relationship between the objective evidence and the claimant's subjective testimony as to pain would unreasonably restrict the ALJ's ability to meaningfully assess a claimant's testimony.

In his decision, the ALJ stated that the record did not indicate the existence of pain of such severity or limitations as to interfere with Neel's ability to perform light work-related tasks. (R. at 16.) In addition to all the evidence referenced earlier with regard to the ALJ's credibility determination, the ALJ specifically noted Neel's report of actual activities, including washing dishes and doing light housework, indicating that he was able to get about in a manner that was not significantly restricted. (R. at 16.) In addition, the undersigned notes that in November 2004, Neel informed Dr. Vernon that he was basically able to perform activities of daily living. (R. at 202.) Notably, the record reveals that Neel never complained of pain to any treating source after he began conservative treatment for his cardiomyopathy and congestive heart

failure and after he stopped consuming alcohol. Even at his hearing before the ALJ, Neel did not testify that his heart condition caused him any pain. He did testify that he suffered from severe headaches, beginning in approximately December 2005, but there is no evidence to support his allegation contained in the record. (R. at 248.) In his brief, Neel focuses on an x-ray of the cervical spine performed in September 1999, which showed advanced degenerative changes in the C4-5 disc spaces and a bone scan from October 2003, which revealed stress fractures in the right third metatarsal and the fifth metatarsophalangeal joint. However, the Commissioner correctly argues in his brief that all of these findings are from the time period during which Neel was deemed disabled and was receiving DIB benefits. Thus, they are irrelevant to the issue of termination of benefits currently before the court.

For all of these reasons, the undersigned finds that substantial evidence supports the ALJ's pain analysis.

Lastly, Neel argues that the ALJ erred by failing to find that he could perform even unskilled, low-stress jobs, given his mental impairment, pursuant to Social Security Ruling, ("S.S.R."), 85-15. Social Security Ruling 85-15 states, in part, as follows:

> Because response to the demands of work is highly individualized, the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job. A claimant's condition may make performance of an unskilled job as difficult as objectively more demanding jobs. Any impairment-related limitation created by an individual's response to demands of work ... must be reflected in the RFC assessment.

-29-

S.S.R. 85-15, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings 1983-1991 (West 1992.)

In this case, Neel does not allege disability based on any mental impairment. At the hearing, the ALJ , based on the testimony of psychological expert Schacht, sent Neel for a consultative psychological evaluation. This evaluation was performed by psychologist Latham on October 6, 2006. Latham concluded that Neel could understand, retain and follow simple instructions and perform routine, repetitive tasks. (R. at 233.) He further found that Neel's attention/concentration abilities were sufficient for simple tasks, his ability to relate interpersonally was mildly impaired and his capacity to handle everyday stressors was mildly impaired. (R. at 233-34.) In a Medical Source Statement Of Ability To Do Work-Related Activities (Mental), also completed on October 6, 2006, Latham reported that Neel was only slightly limited in his abilities to interact appropriately with the public and supervisors, to respond appropriately to work pressures in a usual work setting and to respond appropriately to changes in a routine work setting. (R. at 236.)

In his residual functional capacity finding, the ALJ properly noted Neel's slight limitations in interpersonal relations and stress tolerance. (R. at 15.) In response to a hypothetical question including these nonexertional limitations, the vocational expert testified that such an individual could perform jobs existing in significant numbers in the national economy. (R. at 266-67.) Thus, for all of the above-stated reasons, the court finds unpersuasive Neel's argument that the ALJ erred by failing to find that he could not perform even unskilled, low-stress jobs.

*V. Conclusion*

For the foregoing reasons, the Commissioner's motion for summary judgment will be granted and the Commissioner's decision terminating benefits will be affirmed.

An appropriate order will be entered.

DATED:      This 24th day of November 2008.

/s/   *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE

Case 1:08-cv-00011-PMS   Document 21   Filed 11/24/08   Page 31 of 31   Pageid#: 367